

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA, EX REL. NICOLE BISHOP-TREGEA**, an individual, **MARIA PIATIGORSKI**, an individual, **JAMIE JOHNSON**, an individual, and **SHANNON STEWART**, an individual, | **CIVIL ACTION** |
| | **Case No. 2:20-cv-** |
| Relators/Plaintiffs, | **Judge:** |
| v. | **Mag. Judge:** |
| **LANDMARK HOSPITALS, LLC**, a limited liability company, and **LANDMARK HOSPITAL OF SOUTHWEST FLORIDA, LLC**, a Florida limited liability company, and **LANDMARK MANAGEMENT SERVICES, LLC**, a Florida limited liability company, | **FILED *IN CAMERA* AND UNDER SEAL** |
| Defendants. | |

## COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE QUI TAM PROVISIONS OF THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

NOW COME the Relators ("Relators"), by and through undersigned counsel, on behalf of the United States of America ("United States") and brings this action against Landmark Hospitals, LLC ("Landmark"), Landmark Hospital of Southwest Florida, LLC ("Landmark SWFL"), and Landmark Management Services, LLC ("Landmark MGMT") (collectively "Defendants"), under the False Claims Act, 31 U.S.C. §3729 et. seq. ("FCA"), and in support of the Complaint, the Relators allege as follows:

## CAUSES OF ACTION

1.    This is an action to recover damages and civil penalties on behalf of the United States against the Defendants for submitting and causing to be submitted false claims to the United

States under the government healthcare program, Medicare and Medicaid ("Program"), from the past six (6) years through present ("Relevant Period").

2.      During the Relevant Period, Defendants have fraudulently and systematically billed and/or caused to be billed and, upon information and belief, continues to bill and submit claims and/or cause bills and claims to be submitted to Government Healthcare Programs that are false or fraudulent and/or contain false and fraudulent misrepresentations regarding types and extent of services rendered, the medical necessity of such services and/or up-coding and billing for services never rendered. Defendants have submitted and/or caused to be submitted false claims to receive monies from the Program knowing of the falsity of such claim and the false and fraudulent misrepresentations contained therein.

3.      During the Relevant Period, Defendants fraudulently and systematically reviewed, approved and submitted and/or caused to be submitted billings for services allegedly provided, and upon information and belief, other health services providers, knowing it was unnecessary and contained false and fraudulent misrepresentations.

4.      The Defendants perpetrated these schemes in order to increase billings to and receive revenue from Government Health Care Programs to which they were not entitled.

5.      During the Relevant Period, Defendants have received monies from the Program as a direct and proximate result of its fraudulent claims submitted to the Program and the false and fraudulent misrepresentations contained therein.

6.      Defendants perpetrated this scheme in order to obtain monies from the Program for business and personal profit.

2

## JURISDICTION AND VENUE

7.      These claims arise under the Qui Tam provisions of the FCA. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732 which specifically confer jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

8.      Personal jurisdiction and venue for this action are predicated on 31 U.S.C. §3732(a) which provides: "any action brought under §3720 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant, can be found, resides, transacts business or in which any act proscribed by §3729 occurred." Defendant **LANDMARK** is a limited liability company that conducts its business in, among other places, Collier County, Florida, which is within the Middle District of Florida, Ft. Myers Division. **LANDMARK SWFL** is a critical care hospital in Collier County, Florida that is owned by **LANDMARK**, which contracts with **LANDMARK MGMT** for operational and financial support services.

9.      Under §3720(b)(2) of the FCA, this Complaint is to be filed *In Camera* and remain under seal for a period of at least sixty (60) days, and shall not be served on the Defendants until to Court so orders. The Government may elect to intervene and proceed with the Act within sixty (60) days after it receives both the Complaint and the material evidence and information.

10.     This Court has supplemental jurisdiction over Relators' state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue over the Employment Claims is proper in the United States District Court for the Middle District of Florida because the Relators' reside in, and the Defendants conduct business in, and some or all of the events giving rise to Relators' claims occurred in Collier County,

Florida, which is within the Middle District of Florida. Venue is proper in the Fort Myers Division under Local Rule 1.02(b)(5) since Collier County is within the Fort Myers Division.

**PARTIES**

12.    At all material times, Relator **BISHOP-TREGEA** was a resident of Collier County, Florida. She began her employment with **LANDMARK** in August 2015 as its director of business development and was its chief clinical officer from April 2019 to May 2020.

13.    At all material times, Relator **PIATIGORSKI** was a resident of Lee County, Florida. She worked as one of **LANDMARK**'s clinical liaisons (registered respiratory therapist) from February 2016 to June 16, 2020.

14.    At all material times, Relator **JOHNSON** was a resident of Collier County, Florida. She worked as one of **LANDMARK**'s nurse case managers from April 2019 to April 2020.

15.    At all material times, Relator **STEWART** was a resident of Lee County, Florida. She worked as one of **LANDMARK**'s clinical liaisons (registered respiratory therapist) from October 2015 to June 2020.[1]

16.    Defendant **LANDMARK** is a limited liability company that is headquartered in Naples, Florida, which operate 6 critical care hospitals: 3 in Missouri, 3 in Georgia and 1 in Naples, Florida. A critical care hospital is a healthcare facility that bridges the gap between when a patient is discharged from a traditional hospital but still requires acute care above what a rehabilitative facility or skilled nursing facility could provide. As **LANDMARK** represents on its website, "Our patients may simply need additional time to recover from an illness or injury, or they may present medically complex cases that require a multi-disciplinary approach to extended acute healthcare. Our patients require a higher level of care for a longer period than the average hospital offers; but

---

[1]    Relator Stewart left Landmark for approximately 5-months in 2019 but returned to the company in August 2019.

they are not yet ready to transfer to a sub-acute care facility, such as a skilled nursing facility, or to be discharged."

17.    Defendant **LANDMARK SWFL** is the Florida limited liability company with a principal place of business in Collier County, Florida that is the corporate entity for **LANDMARK**'s critical care hospital in Naples, Florida.

18.    Defendant **LANDMARK MGMT** is the Florida limited liability company with a principal place of business in Collier County, Florida that operates **LANDMARK**'s critical care hospitals, including the one in Naples, Florida.

19.    During the Relevant Period, Defendants fraudulently submitted and/or caused to be submitted claims to receive monies from the Program knowing of the falsity of such claims and the false and fraudulent misrepresentations contained therein.

20.    During the Relevant Period, Defendants received monies from the Program by fraudulent means and perpetrated schemes in order to, and did, obtain monies from the Program, distributing the same to Defendants and Defendants' ownership despite the fact that such monies were fraudulently obtained.

21.    The policies and procedures carried out by the Defendants in perpetrating these schemes were carried out by those persons holding the highest corporate levels of Defendants.

22.    During the Relevant Period, Defendants acted through its principals, officers, agents and employees, and the acts of the Defendants' principals, officers, agents and employees were within the scope of their agency and employment.

23.    As a result of his employment with Defendants, the Relators have first-hand knowledge and information regarding the business operations and fraudulent claims for Program monies paid by the Government Program.

5

24.     Relators bring this action based on direct and independent knowledge. None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4). Notwithstanding the same, Relators are an original source for the facts alleged in this Complaint. The facts and circumstances of the Defendants' violations of the FCA have not been publicly disclosed in a criminal, civil, or administrative hearing; nor in any legislative, administrative, or inspector general report, hearing, audit, or investigation, or in the news media. As a result of their employment with Defendants, Relators have first-hand knowledge of the business operations of the Defendants and their intentional and/or reckless disregard and fraudulent conduct in connection with their knowledge, supervision and direction of the illegal and fraudulent practices carried out by the Defendants.

25.     Simultaneously with the filing of this Complaint, as required under the FCA. Relators have provided to the Attorney General of the United States and the United States Attorney for the Middle District of Florida a statement of all of the material evidence and information relating to the Complaint ("Disclosure Statement"). The Disclosure Statement supports the existence of false claims by the Defendants.

## STATUTORY & REGULATORY BACKGROUND

### A. The False Claims Act

26.     The FCA imposes liability upon any person who (a) "knowingly presents or causes to be presented [to the Government] a false or fraudulent claim for payment or approval"; (b) "knowingly makes, uses, causes to be made or used, a false record or statement material to a false or fraudulent claim," or (c) conspired to defraud the Government by getting a false claims allowed or paid, is liable to the United States for a civil penalty of not less than $5,500.00 and not more

than $11,000.00, plus three (3) times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. §3729(a)(1)(A)-(C), as amended.

27.     The FCA imposes liability not only for the intentionally false or fraudulent conduct, but also where the conduct is merely "in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(1)(A)(iii).

28.     The FCA broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property... that... is made to a contractor, grantee or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, if the United States Government- (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse any portion of the money or property requested or demanded." 31 U.S.C. §3729(b)(2)(A).

29.     The Florida False Claims Act (FFCA) has a nearly identical definition of claim, only substituting Florida or any agency thereof for the United States. F.S. §68.082(1)(b).

### B. Government Health Care Programs.

30.     Medicare is a government financial health insurance program administered by the Social Security Administration of the United States. Medicare was promulgated to provide payment for medical services, durable medical equipment and other related health items for individuals 65 and over. Medicare also makes payment for certain health services provided to additional classes of certain individual healthcare patients pursuant to federal regulations.

31.     Medicare has two parts: Part A, the Basic Plan of Hospital Insurance; and Part B, which covers physicians' services and certain other medical services not covered by Part A. Medicare Part A helps cover inpatient care in hospitals, including critical hospitals, and skilled

7

nursing facilities (not custodial or long-term care). Medicare Part A also helps cover hospice care and some health care. Medicare Part B helps cover physicians' services and outpatient care. It also covers some other medical services that Part A does not cover (i.e. physical and occupational therapist services, etc.). Part B helps pay for covered health services and supplies *when they are medically necessary.*

32.    The federal government enacted the Medicaid program in 1965 as a cooperative undertaking between the federal and state governments to help the states provide healthcare to low income individuals. 42 U.S.C. §§1396-1396v. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") Secretary through the Center for Medicare and Medicaid Services ("CMS"). States pay doctors, hospitals, pharmacies and other providers and suppliers of medical items and services according to established rates. See 42 U.S.C. §§1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended… as medical assistance under the State plan…" See 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as federal financial participation ("FFP").

33.    Much of the daily administration and operation of Medicare is managed through private insurers under contract with the federal government (particularly CMS).

34.    Under Medicare Part B, the federal government contracts with insurance companies and other organizations knows as "carriers" to handle payment for physicians' services in specific geographic areas. These private insurance companies, or "Medicare Carriers," are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

35.    The Principal function of both intermediaries and carriers is to make and audit payments for Medicare services to assure that federal funds are spent properly.

36.    To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent, they are medically necessary. Medicare will only reimburse costs for medical services that are needed for the prevention, diagnosis, or treatment of a specific illness or injury.

## DEFENDANTS' FRAUDULENT SCHEMES & SUBMISSION OF FALSE CLAIMS

37.    The Defendants employ physicians, nurses, medical assistants, practice administrators and an array of support staff.

38.    The vast majority of the Defendants' income arises from claims made to Government Healthcare Programs, such as Medicare.

39.    Based upon their unique positions as employees of the Defendants, the Relators were able to, and did, observe the Defendants submission of false claims to the government through five (5) discrete schemes.

### I.    The Defendants Refuse To or Delay the Discharge of Patients.

40.    Medicare requires the discharge of patients if medically appropriate.

41.    During the Relevant Period, the Defendants engaged in a fraudulent scheme to generate more income from Medicare and Medicaid by refusing to or delaying the discharge of patients who no longer qualified to receive the Defendants' in-patient services.

42.    In 2019 and 2020, the Defendants directed its nurse case managers that they could not discharge such patients because the Defendants needed their income to "look better." This included a complete moratorium on discharges for a period of time, notwithstanding the fact that the discharge of many, many patients was medically appropriate and required.  The Defendants

9

were required by CMS to meet an average length of stay of 25 days; if the Defendants do not meet that criteria, they could lose their license. And so, because they were not going to meet CMS guidelines, the Defendants enacted a scheme of holding patients over.

43.     The Relators received written communications to that effect and were frequently prevented from executing proper discharges based upon Defendants' fraudulent policy.

44.     The Defendants internal reports for January 1, 2020 to June 2, 2020 demonstrate that for patients with private insurance, the average length of stay was approximately 1-day, whereas its Medicare Part-A patients' average length of stay was a whopping 32-days.

45.     The Relators were prevented from discharging many of the Medicare patients contained in the internal report.

46.     Defendants then falsified hundreds, if not thousands, of medical records in order to justify billing for unnecessary days patients spent in Defendants' facilities.

47.     With knowledge of their impropriety and false claims, the Defendants nevertheless submitted bills to Medicare and Medicaid and received Program monies.

**II.     The Defendants Add False or Inflated Diagnoses to Fraudulently Increase Billing, Including Fraudulently Billed Government Health Programs For Surgeries Never Performed Because Its Surgery Center Was Closed Due to the Pandemic.**

48.     The Defendants bill on a diagnosis-related group (DRG) billing basis. This means that rather than paying a hospital for what it spent caring for a hospitalized patient, Medicare pays the hospital a fixed amount based on the patient's DRG or diagnosis. With a DRG, Medicare pays for a hospitalization based on the diagnosis the patient was hospitalized to treat, not based on how much the hospital did to treat the patient, how long the patient was hospitalized, or how much the hospital spent caring for the patient. If the hospital treats the patient while spending less than the

DRG payment, it makes a profit. If the hospital spends more than the DRG payment treating the patient, it loses money.

49.    During the Relevant Period, the Defendants engaged in a fraudulent scheme to generate more income from Medicare and Medicaid by adding false or inflated diagnoses.

50.    For example, on or about December 17, 2019, the Defendants fraudulently changed its diagnosis-related group (DRG) billing from a 4 to a 3 by misrepresenting that there was an extracorporeal membrane oxygenation (ECMO) and a major operating room procedure when in fact the records reflect there was a simple tracheotomy *without* any major operating room procedure.

51.    Similar fraudulently changed diagnoses occurred on or about January 6, 2020 (Patient 700000537), January 24, 2020 (Patient 700000461), January 30, 2020 (Patient 700000578), March 12, 2020 (Patient 700000650), March 16, 2020 (Patient 700000644), April 13, 2020 (Patient 700000690), April 20, 2020 (Patient 700000680), and May 28, 2020 (Patient 700000709).

52.    Additionally, the Defendants repeatedly submitted fraudulent claims for surgeries it represented were performed, which was impossible since its surgery center was closed in mid-March 2020. These included on March 16, 2020 (Patient 700000644), April 13, 2020 (Patient 700000690), April 20, 2020 (Patient 700000680), and May 28, 2020 (Patient 700000709), to name a few.

53.    Defendants have falsified hundreds of medical records in order to justify billing for services never performed.

54.    With knowledge of their impropriety and false claims, the Defendants nevertheless submitted bills to Medicare and Medicaid and received Program monies.

III.    **The Defendants' Coder Directs Physicians to Fraudulently Include Diagnoses & Makes Changes Inconsistent With the Medical Records, Particularly on Short Stays.**

55.    During the Relevant Period, the Defendants engaged in a fraudulent scheme to generate more income from Medicare and Medicaid by directing physicians to include diagnoses regardless of whether or not they were true and making other material alterations and fraudulent submissions to Medicare.

56.    For example, on or about April 10, 2020, the Defendants acknowledged in writing that such a practice was prohibited.

57.    Nevertheless, on April 23, 2020, the Defendants "got so frustrated with documentation issues" surrounding an admission from Dr. Checo that the Defendants coder sent a text message to the physician to advise him of the coder's requested diagnoses. The Defendants' coder suggested this was the Defendants' new policy.

58.    The Defendants' coder also engaged in a fraudulent scheme to submit bills for services and diagnoses not present, such as on or about February 13, 2020 where she changed a legitimate COPD diagnosis to a fraudulent bill for "pulmonary edema and respiratory failure."

59.    Similar fraudulently changed diagnoses and changes to the DRG occurred on or about February 4, 2020 (Patient 700000606), February 7, 2020 (Patient 700000618), February 7, 2020 (Patient 700000577), February 10, 2020 (Patient 700000624), February 18, 2020 (Patient 700000611), February 19, 2020 (Patient 700000591), March 2, 2020 (Patient 700000650), April 2, 2020 (Patient 700000698), April 2, 2020 (Patient 700000648), April 30, 2020 (Patient 700000730), May 13, 2020 (Patient 700000681), and May 14, 2020 (Patient 700000648).

60.    And on short stays, such fraudulent changes were the policy, which was done on January 8, 2020 (Patient 700000568), January 13, 2020, (Patient 700000534), January 16, 2020

(Patient 700000570), February 27, 2020 (Patient 700000634), and April 14, 2020 (Patient 700000682).

61.    Defendants have falsified hundreds of medical records in order to justify billing for services never performed.

62.    With knowledge of their impropriety and false claims, the Defendants nevertheless submitted bills to Medicare and Medicaid and received Program monies.

IV.    **The Defendants Require Patients to Utilize Their Own Prescriptions From Home Despite the Defendants Receiving Reimbursement For the Same.**

63.    During the Relevant Period, the Defendants engaged in a fraudulent scheme to generate more income from Medicare and Medicaid by requiring patients to utilize their prescriptions from home despite the fact they received reimbursement for providing prescriptions as part of the DRG.

64.    Written evidence of this practice occurred on September 13, 2019, September 30, 2019, March 18, 2020, May 1, 2020, and June 2, 2020.

65.    Defendants have required hundreds of patients to provide their own prescriptions.

66.    With knowledge of their impropriety and false claims, the Defendants nevertheless submitted bills to Medicare and Medicaid and received Program monies.

V.    **The Defendants Fraudulently Classify Patients as "Covid-Related," And Fraudulently Attested to Accepting "Covid-Related" Patients to Receive CARES Money.**

67.    Beginning in March 2020, the United States fell victim to the Covid-19 pandemic, which resulted in widespread closures and a slew of "stay-at-home" orders being issued by an array of governmental bodies.

68.    The pandemic resulted in the Defendants' closure of its surgery center and operating rooms.

69.     As a result of the pandemic, Medicare relaxed the requirements for admission to a critical care hospital, such as those operated by the Defendants, and allowed admission of an otherwise nonqualifying patient so long as the otherwise inappropriate admission was either (i) to treat a Covid patient, or (ii) to open beds in a regular hospital that are needed to treat Covid patients.

70.     Nevertheless, the Defendants seized on this opportunity to fraudulently boost their census by having nonqualifying patients admitted under the auspices being related to the Covid pandemic.

71.     More specifically, the Defendants developed a scheme whereby they would admit patients they otherwise were prohibited from admitting and billing Medicare for, fraudulently certifying on the patient's chart that "[t]his admission is in response to the public health emergency, Coronavirus Disease 2019 (Covid-19)."

72.     As has been well-reported, Southwest Florida's hospitals did not suffer nearly the same fate of healthcare inundation as major metropolitan areas, such as New York City, and the census at local hospitals remained very low.

73.     The Defendants did not admit any Covid-positive patients in Naples, Florida, and its acceptance of other nonqualifying patients were *not* the result of any hospital overcrowding at all.

74.     As an example, on April 24, 2020, Patient 700000729 was admitted and was not positive for Covid and did not possess any diagnoses that would allow for admission and subsequent reimbursement for the same by Medicare. However, the Defendants included in his chart that "[t]his admission is in response to the public health emergency, Coronavirus Disease 2019 (Covid-19)," which was patently false.

75.    On May 6, 2020, Patient 700000743 was admitted and was not positive for Covid and did not possess any diagnoses that would allow for admission and subsequent reimbursement for the same by Medicare. However, the Defendants included in her chart that "[t]his admission is in response to the public health emergency, Coronavirus Disease 2019 (Covid-19)," which was patently false.

76.    On May 8, 2010, Patient 700000746 was admitted and was not positive for Covid and did not possess any diagnoses that would allow for admission and subsequent reimbursement for the same by Medicare. However, the Defendants included in his chart that "[t]his admission is in response to the public health emergency, Coronavirus Disease 2019 (Covid-19)," which was patently false.

77.    The Defendants then billed Medicare for these patients.

78.    However, where the patient would otherwise legitimately qualify for admission to one of the Defendants' critical care hospitals, the Defendants would *not* state that "[t]his admission is in response to the public health emergency, Coronavirus Disease 2019 (Covid-19)." As an example, on May 27, 2020, Patient 700000757 was admitted for diagnoses that would qualify for admission and which would allow the Defendants to properly bill Medicare. As a result, the Defendants certified that the admission was *not* related to Covid.

79.    The Relators have first-hand knowledge that the Defendants have not treated any Covid or Covid-related patients at its Naples, Florida hospital.

80.    Notwithstanding the same, the Defendants applied for – and received – government monies through the CARES Act. To date, the Defendant **LANDMARK SWFL** has received at least $1,181,026 from the CARES Act.

81.    In order to receive this money, however, the Defendants fraudulently attested that after January 31, 2020, it provided diagnoses, testing or care for individuals with possible or actual cases of Covid-19, which it did not.

82.    The Defendants also fraudulently certified that the monies will only be used to prevent, prepare for or respond to Covid and that the monies are *only* to reimburse the Defendants for health care related expenses or lost revenues attributable to Covid.

83.    With knowledge of their impropriety and false claims, the Defendants nevertheless submitted bills to Medicare and Medicaid and received Program monies.

## COUNT I- DAMAGES & PENALTIES UNDER THE FCA

**(Defendants' Violation of 31 U.S.C. §3729(a)(1), as amended, 31 U.S.C. §3729(a)(1)(A)**

84.    Relators incorporate by reference the allegations Paragraphs 1-83 as if fully set forth in this Count.

85.    From at least 2016 to present, the Defendants violated the FCA, 31 U.S.C. §3729(a)(1), and as amended, by knowingly, in reckless disregard or deliberate ignorance of the truth or falsity of the information it conveyed, presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

86.    The claims were fraudulent because the Defendants made requests or demands for payment from the Program and all of these were fraudulent attestations by the Defendants in order to receive Program monies.

87.    The monies the Defendants obtained through its false or fraudulent submissions to the Program were provided in whole or in part by the United States.

88.    The United States and Florida were unaware of the falsity of the claims and/or statements which the Defendants submitted and/or caused to be submitted to the United States and

in reliance on the accuracy thereof, paid the Defendants for reimbursement that otherwise would not have been paid and/or were ineligible for payment.

89.    The United States and Florida, being unaware of the falsity of the claims and/or statements caused to be made by the Defendants and in reliance on the accuracy thereof, paid and continues to pay the Defendants for Program monies that would otherwise not have been paid and/or were ineligible for payment.

90.    The Defendants' compliance with the Program, Medicare and state regulations was material to the United States' and Florida's decision to disburse funds to the Defendants.

91.    By reason of the Defendants' wrongful conduct, the United States has suffered and continues to suffer substantial damages.

WHEREFORE, the Relators respectfully request this Court to award the following damages to the following parties and against the Defendants:

To the United States:

1)    Three times the amount of actual damages which the United States has sustained as a result of the Defendants' conduct;

2)    A civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim which the Defendants caused to be submitted to the United States;

3)    Prejudgment Interest;

4)    All costs incurred in bringing this action.

To the Relators:

1)    The maximum amount allowed pursuant to §3730(d) of the FCA and/or any other applicable provision of law;

2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

3) An award of reasonable attorney's fees and costs, and;

4) Such further relief as this Court deems equitable and just.

## COUNT II- DAMAGES & PENALTIES UNDER THE FCA

**(Defendants' Violation of 31 U.S.C. §3729(a)(1), as amended, 31 U.S.C. §3729(a)(1)(B)**

92.    Relators incorporate by reference the allegations Paragraphs 1-83 as if fully set forth in this Count.

93.    From at least 2016 to present, the Defendants violated the FCA, 31 U.S.C. §3729(a)(1), and as amended, by knowingly, in reckless disregard or deliberate ignorance of the truth or falsity of the information it conveyed, presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

94.    The claims were fraudulent because the Defendants made requests or demands for payment from the Program and all of these were fraudulent attestations by the Defendants in order to receive Program monies.

95.    The monies the Defendants obtained through its false or fraudulent submissions to the Program were provided in whole or in part by the United States.

96.    The United States and Florida were unaware of the falsity of the claims and/or statements which the Defendants submitted and/or caused to be submitted to the United States and in reliance on the accuracy thereof, paid the Defendants for reimbursement that otherwise would not have been paid and/or were ineligible for payment.

97.    The United States and Florida, being unaware of the falsity of the claims and/or statements caused to be made by the Defendants and in reliance on the accuracy thereof, paid and

continues to pay the Defendants for Program monies that would otherwise not have been paid and/or were ineligible for payment.

98.    The Defendants' compliance with the Program, Medicare and state regulations was material to the United States' and Florida's decision to disburse funds to the Defendants.

99.    By reason of the Defendants' wrongful conduct, the United States has suffered and continues to suffer substantial damages.

WHEREFORE, the Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the United States:

1) Three times the amount of actual damages which the United States has sustained as a result of the Defendants' conduct;

2) A civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim which the Defendants caused to be submitted to the United States;

3) Prejudgment Interest;

4) All costs incurred in bringing this action.

To the Relators:

1) The maximum amount allowed pursuant to §3730(d) of the FCA and/or any other applicable provision of law;

2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

3) An award of reasonable attorney's fees and costs, and;

4) Such further relief as this Court deems equitable and just.

19

## COUNT III- DEFENDANTS' VIOLATION OF THE FLORIDA FALSE CLAIMS ACT

100.     Relator incorporates by reference the allegations in Paragraphs 1-83 as if fully set forth in this paragraph.

101.     This is a *qui tam* action brought by the Relators on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. §68.081 *et seq.*

102.     Fla. Stat. §68.082(2) provides liability for any person who:

(a)     Knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval:

(b)     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency.

103.     From at least 2016 to present, the Defendants violated the Florida FCA (FFCA) Fla. Stat. §68.082(2) by knowingly, in reckless disregard or deliberate ignorance of the truth or falsity of the information they conveyed, presented or caused to be presented false or fraudulent claims for payment or approval to the State of Florida.

104.     From at least 2016 to present, the Defendants violated the FFCA, Fla. Stat. §68.082(2)(b) by knowingly, in reckless disregard or deliberate ignorance of the truth or falsity of the information they conveyed, presented or caused to be made or used a false record or statement material to a false or fraudulent claim paid or approved by an agency.

105.     The claims were fraudulent because the Defendants made requests or demands for payment from the Program and all of these were fraudulent attestations by the Defendants in order to receive Program monies.

106.     The monies the Defendants obtained through their false or fraudulent submissions to the Program were provided in whole or in part by the State of Florida.

107.    The State of Florida was unaware of the falsity of the claims and/or statements which the Defendants submitted and/or caused to be submitted to the United States and in reliance on the accuracy thereof, paid the Defendants for reimbursement that otherwise would not have been paid and/or were ineligible for payment.

108.    The State of Florida, being unaware of the falsity of the claims and/or statements caused to be made by the Defendants and in reliance on the accuracy thereof, paid and continues to pay the Defendants for Program monies that would otherwise not have been paid and/or were ineligible for payment.

109.    Compliance with applicable Medicare, Medicaid and the various other federal and states laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida by the Defendants. Compliance with applicable Florida statutes/regulations was also an express condition of payment of claims submitted to the State of Florida.

110.    Had the State of Florida known that the false representations were made by the Defendants, it would not have paid the claims.

111.    As a result of the Defendants' violations of Fla. Stat. §68.082(2), the State of Florida has been damaged.

112.    Relator has direct and independent knowledge of the allegations of this Complaint and has brought this action pursuant to Fla. Stat. §68.083(2) on behalf of himself and the State of Florida.

WHEREFORE, the Relators respectfully request this Court to award the following damages to the following parties and against the Defendants:

To the United States:

1) Three times the amount of actual damages which the State of Florida has sustained as a result of the Defendants' conduct;

2) A civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim which the Defendants caused to be submitted to the State of Florida;

3) Prejudgment Interest;

4) All costs incurred in bringing this action.

To the Relators:

1) The maximum amount allowed pursuant to Fla. Stat. §68.085 and/or any other applicable provision of law;

2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

3) An award of reasonable attorney's fees and costs, and;

4) Such further relief as this Court deems equitable and just.

### DEMAND FOR JURY TRIAL

**NOW COME** the Relators, by and through their undersigned attorney, and demands a jury trial under Federal Rule of Civil Procedure 38 on all issues triable of right by a jury in this action.

Respectfully submitted,

Dated: June 24, 2020

**/s/ Benjamin H. Yormak**
Benjamin H. Yormak
Florida Bar Number 71272
Trial Counsel for Relator/Plaintiff
YORMAK EMPLOYMENT & DISABILITY LAW
9990 Coconut Road
Bonita Springs, Florida 34135
Telephone: (239) 985-9691
Fax: (239) 288-2534
Email: byormak@yormaklaw.com

22